UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA

-v.-

ANGEL OTERO,

Defendant.

---

ANGEL OTERO,

Movant,

-v.-

UNITED STATES OF AMERICA,

Respondent

15 Cr. 608-10 (KPF)

**OPINION AND ORDER**

20 Civ. 4711 (KPF)

KATHERINE POLK FAILLA, District Judge:

Angel Otero was arrested in September 2015 as part of the takedown of the Taylor Avenue Crew, the violent drug-dealing gang of which he was a key member. After pleading guilty to controlled substance and firearms charges pursuant to a written plea agreement with the Government, Mr. Otero was sentenced principally to an aggregate term of 150 months' imprisonment in January 2017. In June 2020, Mr. Otero moved to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. § 2255, and in November 2020, he moved for compassionate release in the form of immediate release from custody pursuant to 18 U.S.C. § 3582(c)(1)(A)(i). With the submission of supplemental briefs on February 17 and March 7, 2023, the parties' briefing on the motions is complete. For the reasons set forth in the remainder of this Opinion and

Order, the Court denies Mr. Otero's Section 2255 motion and grants in part his Section 3582(c) motion.

## BACKGROUND[1]

### A.    The Offense Conduct

Angel Otero was a longtime member of the Taylor Avenue Crew (also referred to as the "Crew"). (*See, e.g.*, Final Presentence Investigation Report ("PSR" (Dkt. #144)) ¶¶ 47-50. At least as early as 2013, when he was sixteen years old, Mr. Otero sold crack cocaine in Crew territory. (*Id.* ¶¶ 102-105 (detailing October 21, 2013 arrest)). What is more, Mr. Otero frequently possessed guns in furtherance of Crew business. Mr. Otero acknowledged to his brother Leonardo during a recorded telephone call that while selling drugs on behalf of the Crew, he always carried a gun for protection. (*Id.* ¶ 47). On May 21, 2014, Mr. Otero shot a member of the rival Leland Avenue Crew (*id.* ¶ 48), and on July 27, 2014, Mr. Otero shot another member of the Leland Avenue Crew as well as two bystanders (*id.* ¶ 49).

### B.    Mr. Otero's Arrest, Pretrial Motion Practice, and Guilty Plea

Mr. Otero was arrested on September 9, 2015. (PSR ¶ 57). On December 17, 2015, the Government filed a sealed superseding juvenile information, S2 15 Cr. 608 (KPF) (the "Juvenile Information" or the "Information"), charging him with committing five acts of juvenile delinquency.

---

[1]    Familiarity with the Court's prior decision in this matter is presumed, including in particular its discussion of the factual and procedural histories of the case. *United States* v. *A.O.*, No. 15 Cr. 608-10 (KPF), 2016 WL 4197597 (S.D.N.Y. Aug. 8, 2016). Unless otherwise indicated, references to docket entries are to the docket in Mr. Otero's criminal case, No. 15 Cr. 608 (KPF).

*See United States* v. *A.O.*, No. 15 Cr. 608-10 (KPF), 2016 WL 4197597, at *1 (S.D.N.Y. Aug. 8, 2016). The Government then moved under the Juvenile Justice and Delinquency Prevention Act (the "JJDPA"), 18 U.S.C. §§ 5031-5042, for an order transferring Mr. Otero to adult status and allowing the Government to proceed by criminal indictment. While that motion was pending, the Government obtained a superseding indictment, S3 15 Cr. 108 (KPF) (the "S3 Indictment"), which charged Mr. Otero with racketeering, narcotics, and firearm offenses that the Government claimed were committed by him after his eighteenth birthday.

The S3 Indictment mooted several of the charged acts of juvenile delinquency, but the Government proceeded with its motion to transfer the three remaining acts, which alleged Mr. Otero's participation in a racketeering enterprise and his assault and attempted murder of two different rival drug traffickers. In connection with the transfer motion, the Court received comprehensive submissions from the parties (as well as a psychological report prepared by a court-appointed expert witness), convened a one-day evidentiary hearing, and heard oral argument over two days. In a decision first issued under seal on June 12, 2016, and later issued in redacted form on August 8, 2016, the Court granted the Government's motion to transfer. *See A.O.*, 2016 WL 4197597, at *5-11. (*See also* Dkt. #133 (transcript of pretrial conference of July 12, 2016, at which publication of decision was discussed)).

Mr. Otero was arraigned on June 20, 2016. (Minute Entry for June 20, 2016). The following month, a change of plea hearing was scheduled for

July 28, 2016.  (Minute Entry for July 21, 2016).  That day, Mr. Otero pleaded guilty to racketeering conspiracy, in violation of 18 U.S.C. § 1962(d) (Count One), and to the use, carrying, or possession of a firearm in connection with a crime of violence and a drug-trafficking offense, in violation of 18 U.S.C. § 924(c)(1)(A)(i) (Count Thirteen).  (Dkt. #185 (plea transcript)).[2]  Mr. Otero's plea was entered pursuant to a written plea agreement with the Government that, among other things, made clear that the Count Thirteen offense was predicated on Mr. Otero's use, carrying, or possession of one or more firearms in connection with *both* a crime of violence and a drug-trafficking offense.  (Dkt. #458 (the "Plea Agreement" dated July 13, 2016)).  The Plea Agreement also contained a written stipulation between the parties concerning the application of the United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") to Mr. Otero's case; in particular, the parties agreed that the relevant Guidelines range was 181 to 211 months' imprisonment.  (*Id.* at 5).

As relevant here, during the plea proceeding, the Court confirmed with Mr. Otero his understanding of the elements of the Count Thirteen offense. (Dkt. #185 at 14-15 (Mr. Otero acknowledging that the third element of Count Thirteen required proof that he used, carried, or possessed a firearm "during and in relation to a drug trafficking crime or crime of violence for which he could be punished in a federal court")).  When asked to describe his offense conduct, Mr. Otero responded as follows:

---

[2]      The Government agreed to accept a plea to the lesser-included offense of use, carrying, or possession of a firearm, without regard to its discharge.  (*See* Dkt. #458 at 1).

> From in or about 2012 to 2015, I associated myself with
> a group of people. The prosecutors call them the Taylor
> Avenue Crew. I knew that drugs were sold to the group.
> I also knew that sometimes guns were used with the
> drug sales. I agreed to help them. I knew it was ...
> wrong at the time, and my participation continued after
> my 18th birthday. The activities were in the Bronx.

(Dkt. #185 at 27-28; *see also id.* at 29-30 (Mr. Otero acknowledging that the
Taylor Avenue Crew engaged in "the selling of drugs and the use of violence or
threats of violence to preserve the territory of the organization," and that he
"either used or aided others in using a firearm in connection with the work or
the efforts of the Taylor Avenue Crew"); *id.* at 33-34 ("The government would
show at trial that these shootings were undertaken to further the activities of
the Taylor Crew in that they helped to cement the Taylor Avenue Crew's control
of this drug territory, they also furthered the reputation of the Taylor Avenue
Crew, and they helped the defendant himself, Mr. Otero, to maintain or
increase his status in the Taylor Avenue Crew.")). At the conclusion of the
proceeding, the Court accepted Mr. Otero's guilty plea. (*Id.* at 35).

## C.  The Sentencing Proceedings

Mr. Otero was sentenced on January 13, 2017. (*See* Dkt. #189
(sentencing transcript), 182 (judgment)). At the outset of the sentencing
proceeding, counsel for Mr. Otero requested that any sentence imposed by the
Court include both mental health and drug/alcohol counseling as special
conditions of supervised release. (Dkt. #189 at 14). Thereafter, the Court
heard the main sentencing presentation of the Government, as well as

testimony from one of Mr. Otero's shooting victims.  (*Id.* at 15-29).[3]  The Court
then heard from counsel for Mr. Otero, who opined that one consequence of the
instant prosecution being in federal court was that the federal Bureau of
Prisons (the "BOP") would have "far superior" resources to assist Mr. Otero
than its state counterparts.  (*Id.* at 31).  Counsel also reiterated the defense
view that

> in order to continue his path toward being a productive
> member of society, [Mr. Otero] needs to get that which
> was ill afforded to him in the past when he was 14 years
> old, which was the drug and alcohol and certainly the
> psychological counseling going forward as special
> conditions of supervised release.

(*Id.* at 32).  Finally, the Court heard from Mr. Otero, who stated, in part:

> I am excited to work hard every day to improve myself.
> I have learned that the greatest investment that one can
> make is the investment of time into one's self.  I choose
> to invest myself — in myself and live up to my full
> potential, and in this I reject the violence and I reject
> the culture of death.

(*Id.* at 37-38).

After taking a break to consider the statements and arguments of the
parties, the Court imposed a below-Guidelines sentence:

> I can't not think about the manner in which this
> neighborhood was terrorized.  I can't put aside the
> violence and the shootings and the foolish reasons for
> the shootings and the fact that they happened in
> circumstances not suggesting imminent need for
> defending against imminent harm.  I'm glad to hear that

---

[3]     The Court also received a letter from the victim of Mr. Otero's other shooting incident, in
which that victim indicated that he believed Mr. Otero had changed since the incident
and that he forgave Mr. Otero.  (Dkt. #189 at 35 (referring to letter)).

the gang, at least for now, has a much lessened impact in the neighborhood.

So thinking about all that is Mr. Otero — the good, the love he has for his mother and his siblings, the efforts that he's made as evidenced by the materials from the BOP during this incarceration, the letters, the letters that I received, and I know the support he's received from his family because his mom has been present at many of these proceedings — and weighing against that all of the very bad things and all of the violence and the concerns that people have and that I have about his ability for rehabilitation, I'm going to vary downward slightly, but I'm not going to vary downward to the level suggested by defense counsel.

On Count One I'm imposing a term of 90 months incarceration, and that is a downward variance to account for not especially the youth and the troubled upbringing, but really more so for the efforts that were made while in prison and that Mr. Otero has indicated he will continue to make about developing himself into the blessing that he wishes to be for his family and his community.  And I will order that that be followed by the 60-month consecutive term of imprisonment on Count Thirteen that is required under the law.

(Dkt. #189 at 141-42).  The Court ordered that the term of imprisonment be followed by concurrent three-year terms of supervised release.  (*Id.* at 43).  Mr. Otero did not file a direct appeal from his conviction or sentence.

### D.    The Instant Motions

In a *pro se* motion dated June 11, 2020, Mr. Otero sought vacatur of his conviction under Count Thirteen.  (Dkt. #430).  The Court issued a scheduling order for the Government's response (Dkt. #431), which was received on August 21, 2020 (Dkt. #455).  The Court scheduled a reply for Mr. Otero (Dkt. #431), and even extended the time for a reply because of concerns regarding the mail (Dkt. #464), but no reply was filed.

On November 15, 2020, Mr. Otero filed a second *pro se* motion, this one seeking his immediate release from custody because of the COVID-19 pandemic (Dkt. #474), as well as a request for the appointment of counsel to assist him with the motion (Dkt. #475).  The Court appointed the firm of Kaplan Hecker & Fink LLP to assist Mr. Otero pursuant to the Criminal Justice Act.[4]  Defense counsel filed a supplemental submission on March 5, 2021 (Dkt. #496); the Government filed its response in opposition on March 26, 2021 (Dkt. #502); and defense counsel filed Mr. Otero's reply on April 12, 2021 (Dkt. #506).  Supplemental submissions were then filed by the defense on June 25, 2021 (Dkt. #532), June 30, 2021 (Dkt. #534), July 7, 2021 (Dkt. #539), and April 13, 2022 (Dkt. #606).

On January 23, 2023, the Court invited supplemental briefing from the parties.  (Dkt. #633).  Defense counsel filed a supplemental brief on February 17, 2023 (Dkt. #634), and, after receiving an extension, the Government filed a supplemental brief on March 7, 2023 (Dkt. #637).

---

[4]     The Court pauses to thank the Kaplan Hecker firm for its excellent submissions in this case.

## DISCUSSION

**A.    The Court Denies Mr. Otero's Section 2255 Motion**

     **1.    Applicable Law**

          **a.    Motions Under 28 U.S.C. § 2255**[5]

A prisoner in federal custody may seek to have his sentence vacated, set aside, or corrected on the grounds that it "was imposed in violation of the Constitution or laws of the United States, or that the [trial] court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack[.]"  28 U.S.C. § 2255(a).  However, the grounds for a collateral attack under Section 2255 are much more limited than those available on a direct appeal.  *See United States* v. *Addonizio*, 442 U.S. 178, 185 (1979).  Relief may lie "only for a constitutional error, a lack of jurisdiction in the sentencing court, or an error of law or fact that constitutes 'a fundamental defect which inherently results in a complete miscarriage of justice.'"  *United States* v. *Bokun,* 73 F.3d 8, 12 (2d Cir. 1995) (quoting *Hill* v. *United States*, 368 U.S. 424, 428 (1962)).

A federal prisoner seeking relief under Section 2255 must generally file a motion within one year from the latest of four benchmark dates, that is, from the date when: (i) the judgment of conviction becomes final; (ii) a government-created impediment to making such a motion is removed; (iii) the right asserted is initially recognized by the Supreme Court, if it has been made retroactively

---

[5]    Caselaw in this area uses the terms "movant," "petitioner," and "defendant" interchangeably.

available to cases on collateral review; or (iv) the facts supporting the claim(s) could have been discovered through the exercise of due diligence.  *See* 28 U.S.C. § 2255(f).

"[A] § 2255 petition cannot be used to 'relitigate questions which were raised and considered on direct appeal.'"  *United States* v. *Sanin*, 252 F.3d 79, 83 (2d Cir. 2001) (quoting *Cabrera* v. *United States*, 972 F.2d 23, 25 (2d Cir. 1992)).  What is more, Section 2255 cannot be used to bring claims for the first time that could have been raised on direct appeal.  *See Bousley* v. *United States*, 523 U.S. 614, 622-23 (1998).  Where the petitioner has procedurally defaulted on a claim by failing to raise it on direct appeal, the claim may be raised pursuant to Section 2255 only if the petitioner can demonstrate (i) cause for the failure to raise the claim and prejudice from the alleged error, or (ii) actual innocence of the crime.  *Id.*

Cause can be established by showing that the default was the result of "some objective factor external to the defense."  *Murray* v. *Carrier*, 477 U.S. 478, 488 (1986).  For example, where a claim "is so novel that its legal basis is not reasonably available to counsel, a defendant has cause for his failure to raise the claim."  *United States* v. *Whitman*, 115 F. Supp. 3d 439, 443 (S.D.N.Y. 2015) (quoting *Reed* v. *Ross*, 468 U.S. 1, 16 (1984)) (internal quotation marks omitted).  "[A] claim is not reasonably available when, at the time of the procedural default, binding precedent foreclosed the argument or when the defendant lacked the relevant tools with which to raise his claim on direct appeal."  *Id.* (citations and internal quotation marks omitted).  To demonstrate

prejudice, the petitioner must show "not just that the errors 'created a possibility of prejudice, but that they worked to his actual and substantial disadvantage.'" *Borrego* v. *United States*, 975 F. Supp. 520, 522 (S.D.N.Y. 1997) (quoting *United States* v. *Frady*, 456 U.S. 152, 170 (1982)).  In the context of a guilty plea, a petitioner "must show that there is a reasonable probability that, but for [the] errors, he would not have pleaded guilty and would have insisted on going to trial." *Hill* v. *Lockhart*, 474 U.S. 52, 59 (1985) (discussing prejudice in the context of an ineffective assistance of counsel claim); *see also Strickler* v. *Greene*, 527 U.S. 263, 296 (1999) (finding no prejudice from procedural default since "petitioner has not shown that there is a reasonable probability that his conviction or sentence would have been different").

Alternatively, the petitioner may show that the federal court's refusal to consider the merits of his claim will result in a fundamental miscarriage of justice, because he is "actually innocent" of the crimes for which he was convicted.  *Aparicio* v. *Artuz*, 269 F.3d 78, 90 (2d Cir. 2001).  A court may find that a petitioner is actually innocent only when, after reviewing all of the evidence, it concludes that "no reasonable juror would have found petitioner guilty beyond a reasonable doubt." *Doe* v. *Menefee*, 391 F.3d 147, 162 (2d Cir. 2004) (internal quotation marks omitted).

### b.   18 U.S.C. § 924(c)

Title 18, United States Code, Section 924(c)(1)(A) prohibits "during and in relation to any crime of violence or drug trafficking crime ... us[ing] or

carr[ying] ... or ... possess[ing] a firearm."  Section 924(c)(2) defines a "drug

trafficking crime" to include "any felony punishable under the Controlled

Substances Act ..., the Controlled Substances Import and Export Act ..., or

chapter 705 of title 46."  Section 924(c)(3) defines a "crime of violence" as "an

offense that is a felony" and:

> (A) has as an element the use, attempted use, or
> threatened use of physical force against the person or
> property of another, or
>
> (B) that by its nature, involves a substantial risk that
> physical force against the person or property of another
> may be used in the course of committing the offense.

The first subpart of Section 924(c)(3) is commonly called the "elements clause,"

and the second subpart is commonly called the "residual clause."  *United

States* v. *Davis*, 139 S. Ct. 2319, 2324 (2019).  The parties have referred in

their briefing to the clauses as the "force clause" and the "risk of force clause."

(Dkt. #430 at 6-7; Dkt. #455 at 3 (Government)).

The residual clause contained in Section 924(c) and other statutes has

been extensively litigated.  *See Jackson* v. *United States*, No. 16 Civ. 4792

(LAP), 2022 WL 976358, at *4 (S.D.N.Y. Mar. 31, 2022) (discussing evolution of

the definition of "crime of violence").  In 2015, the Supreme Court struck down

a similar residual clause in the Armed Career Criminal Act, 18 U.S.C.

§ 924(e)(2)(B), reasoning that the residual clause was unconstitutionally vague.

*See Johnson* v. *United States*, 576 U.S. 591 (2015).  Three years later, the Court

invalidated the residual clause of the INA, 18 U.S.C. § 16.  *See Sessions* v.

*Dimaya*, 138 S. Ct. 1204, 1215-16 (2018).  The following year, the Court

applied *Johnson* to strike down the residual clause of Section 924(c)(3) as unconstitutionally vague as well.  *Davis*, 139 S. Ct. at 2323-24.

After *Davis*, the predicate crime of violence required to sustain a conviction under Section 924(c) must be a crime of violence as defined by the elements clause.  Generally speaking, conspiracy offenses do not meet this definition.  *See, e.g.*, *United States* v. *McCoy*, 995 F.3d 32, 52 (2d Cir. 2021).  More specifically, the Second Circuit has found that RICO conspiracy is not a crime of violence under Section 924(c)(3).  *See United States* v. *Capers*, 20 F.4th 105, 120 (2d Cir. 2021) ("In sum, it cannot be the case that RICO conspiracy categorically 'has as an element the use, attempted use, or threatened use of physical force against the person or property of another.'  18 U.S.C. § 924(c)(3)(A).  Thus, RICO conspiracy is not a crime of violence."); *see also United States* v. *Martinez*, 991 F.3d 347, 354 (2d Cir. 2021) ("We can assume that the [RICO] conspiracy violation is not a crime of violence under the force clause because, as the Supreme Court's decision in *Davis* reasoned, a conspiracy offense cannot categorically involve the use of force, since its key element is simply an agreement to commit a crime." (citing *Davis*, 139 S. Ct. at 2325, and *United States* v. *Barrett*, 937 F.3d 126, 127 (2d Cir. 2019))).  Of note, however, Section 924(c) convictions predicated on a narcotics trafficking offense are unaffected by *Davis*.  *See, e.g.*, *United States* v. *White*, 7 F.4th 90, 104 (2d Cir. 2021) (concluding that Section 924(c) conviction should stand if an indictment alleged two predicate crimes of violence for the Section 924(c) count, one of which had since been determined to be an invalid predicate, if there was

13

evidence that a defendant committed the still-valid predicate offense); *United States* v. *Kilpatrick*, No. 15-3012-cr, 2021 WL 3354737, at *4-5 (2d Cir. Aug. 3, 2021) (summary order), *cert. denied sub nom. Taylor* v. *United States*, 142 S. Ct. 502 (2021); *United States* v. *Dussard*, 967 F.3d 149, 156 (2d Cir. 2020); *see generally Roberts* v. *United States*, No. 15 Cr. 95-16 (AJN), 2022 WL 1471309, at *3 (S.D.N.Y. May 10, 2022) (collecting cases where courts have upheld Section 924(c) convictions after *Davis*).

### 2.    Analysis

#### a.    The Court Will Not Enforce Mr. Otero's Appellate Waiver

Though the Government does not raise this argument, the waiver provision of Mr. Otero's Plea Agreement seemingly bars him from bringing this motion.  It is settled law that "[a] defendant's knowing and voluntary waiver of the right to appeal or collaterally attack his conviction and/or sentence is enforceable."  *Sanford* v. *United States*, 841 F.3d 578, 580 (2d Cir. 2016) (collecting cases).  More to the point, Second Circuit precedent "foreclose[s] the possibility that a plea agreement can be nullified by a change in law *after* the agreement is executed."  *Unites States* v. *Riggi*, 649 F.3d 143, 149 n.7 (2d Cir. 2011); *see also Sanford*, 841 F.3d at 580 ("[A] defendant's inability to foresee [a change in the law] does not supply a basis for failing to enforce an appeal waiver." (internal quotation marks omitted)); *see also United States* v. *Santiago*, 806 F. App'x 32, 34 (2d Cir. 2020) (summary order) (rejecting argument that appeal waiver in plea agreement was nullified by subsequent change in law reflected in *Davis*); *accord United States* v. *Crews*, No. 20-3820, 2022 WL

777684, at *3 (2d Cir. Mar. 15, 2022) (summary order); *United States* v.

*Borden*, 16 F.4th 351, 353-56 (2d Cir. 2021).

As noted, Mr. Otero pleaded guilty pursuant to a written Plea Agreement

in which he waived certain rights and agreed "not [to] file a direct appeal; nor

bring a collateral challenge, including but not limited to an application under

Title 28, United States Code, Section 2255 and/or Section 2241; nor seek a

sentence modification pursuant to Title 18, United States Code, Section

3582(c), of any sentence within or below the Stipulated Guidelines Range of

181 to 211 months' imprisonment." (Dkt. #458 at 6). During the plea

proceeding, the Court drew Mr. Otero's attention to the waiver paragraph of the

Plea Agreement, and confirmed his waiver of his right to "to appeal or otherwise

challenge a term of imprisonment that is 211 months or less." (Dkt. #185 at

26). *See* Fed. R. Crim. P. 11(b)(1)(N) ("During [the plea colloquy], the court

must inform the defendant of, and determine that the defendant understands,

the following: … (N) the terms of any plea-agreement provision waiving the right

to appeal or to collaterally attack the sentence[.]"); *see also United States* v.

*Salmonson*, 759 F. App'x 106, 108 (2d Cir. 2019) (summary order) (finding

appellate waiver to have been knowingly and voluntarily made, and thus

enforceable). On the theory that the Government's failure to raise the provision

in its opposition papers has "waived the waiver," as it were, the Court will

continue with its analysis. *See generally United States* v. *Quiroz*, 22 F.3d 489,

491 (2d Cir. 1994) (discussing circumstances in which Government failure to raise argument amounts to waiver of otherwise applicable waiver).[6]

### b. Mr. Otero's Conviction Under Section 924(c) Is Valid, Even After *Davis*

Ultimately, Mr. Otero's *Davis* claim fails on the merits. Understandably, Mr. Otero focuses on *Davis*'s treatment of the residual clause and its consequent disqualification of RICO conspiracy as a crime of violence. (*See, e.g.*, Dkt. #430 at 7-8). In so doing, however, Mr. Otero overlooks the additional — and still valid — predicate of narcotics trafficking, *i.e.*, Mr. Otero's use of the firearm in furtherance of the Taylor Avenue Crew's narcotics trafficking. To review, the Indictment to which Mr. Otero pleaded guilty detailed a racketeering enterprise whose very *raison d'être* was the sale of crack cocaine in and around Taylor Avenue in the Bronx. (Dkt. #73 ¶¶ 1-6). Acts of violence committed by Crew members were not indicative of a second, separate line of business, but rather were inextricably bound up in the Crew's narcotics trafficking. (*Id.* ¶ 5 ("Certain members and associates of the Taylor Avenue Crew committed and agreed, attempted, and threatened to commit acts of violence *to protect and expand their drug trafficking operation and to protect*

---

[6] For similar reasons, the Court finds that the Government has waived any claim of procedural bar attributable to Mr. Otero's failure to raise a *Davis* claim on direct appeal. *See Jiau* v. *United States*, No. 11 Cr. 161-1 (JSR) (JCF), 2016 WL 11201437, at *5 (S.D.N.Y. Nov. 16, 2016) ("Rather, the Government is considered to have 'forfeited or waived the argument' when it fails to raise procedural default, leaving it to the court's discretion whether to raise the issue itself." (citations omitted)), *report and recommendation adopted*, 2018 WL 2122817 (S.D.N.Y. May 8, 2018). The Second Circuit recently found the holding in *Davis* to apply retroactively to cases on direct review, which may have impacted the Court's cause and prejudice analysis. *Hall* v. *United States*, 58 F.4th 55, 62 (2d Cir. 2023).

*fellow members and associates of the Enterprise.*" (emphasis added)); *see also id.* ¶ 30 (Count Thirteen)).

Mr. Otero pleaded guilty pursuant to a Plea Agreement with the Government in which he specifically agreed to plead to a Section 924(c) charge that was predicated on two offenses, including, as relevant here, his use and possession of one or more firearms in furtherance of the charged narcotics conspiracy. (Dkt. #458 at 1). During his plea allocution, Mr. Otero was specifically advised (and acknowledged) that the Section 924(c) offense to which he was pleading guilty was predicated in part on the narcotics conspiracy. (Dkt. #185 at 13-15). And Mr. Otero was allocuted at length concerning his involvement in selling cocaine, as well as his (and the Crew's) use of guns "with the drug sales." (*Id.* at 27; *see also id.* at 28-29 (admitting his agreement to assist the Taylor Avenue Crew in selling crack cocaine and marijuana, and his involvement in selling narcotics for the Crew); *id.* at 29 (admitting his use, carrying, or possession of a gun "in connection with activities of the [Taylor Avenue Crew]")). In short, abundant evidence in the record confirms not only Mr. Otero's involvement in the charged narcotics conspiracy, but his use and possession of firearms in furtherance of that conspiracy.

In this regard, the Court is guided by the Second Circuit's analysis in *United States* v. *Dussard*, 967 F.3d 149, 156 (2d Cir. 2020). The defendant in *Dussard* had been involved in planning an armed robbery of a drug dealer; he was charged with conspiracy to commit Hobbs Act robbery, conspiracy to distribute narcotics, and possession of a gun during and in relation to a crime

of violence and a drug trafficking crime. *Id.* at 151-52. Dussard agreed to plead guilty to the Hobbs Act conspiracy charge and the Section 924(c) charge (the latter of which was predicated on the Hobbs Act conspiracy charge), and the Government agreed to drop the narcotics distribution charge. *Id.* at 152. After *Davis* held that Hobbs Act robbery conspiracy was no longer a crime of violence for purposes of Section 924(c), defense counsel withdrew a previously filed brief pursuant to *Anders* v. *California*, 386 U.S. 738 (1967), and argued on appeal for vacatur of the Section 924(c) count. *Id.* at 154.

The Second Circuit reviewed Dussard's challenge for plain error, focusing in particular on whether the claimed error affected Dussard's substantial rights, which in the context of a conviction after a guilty plea required him to demonstrate that "there is a 'reasonable probability' that the error" in that case "affected the outcome of the proceeding." 967 F.3d at 156. After reviewing the text of the indictment, Dussard's statements during the plea proceeding, the presentence investigation report's factual recitation (to which the defense had not objected), the benefits to Dussard in accepting a guilty plea that did not include a plea to a narcotics trafficking offense with a ten-year mandatory minimum term, and Dussard's statements accepting responsibility, the Second Circuit concluded that Dussard had failed to show that his plea of guilty to the Section 924(c) offense "adversely affected his substantial rights, given the record as a whole." *Id.* at 156-57.

Among other things, the Court observed that Dussard "would have had little genuine hope of being acquitted of the ... drug trafficking conspiracy after

a trial." 967 F.3d at 157.  The *Dussard* Court also noted that "nothing about [Dussard's] plea or the plea hearing itself provides any basis for an argument that he was willing to plead guilty to [the Section 924(c) charge] only if it was tied to the charge of Hobbs Act conspiracy ... instead [of] the drug trafficking predicate," which has "no difference in the offense of conviction or in the punishment."  *Id.* at 158.  To the contrary, Dussard was "motivated — and the government was willing — to enter into a plea agreement that would allow him to plead guilty to a § 924(c)(1)(A)(i) offense, with its mandatory minimum consecutive five-year prison term, plus an offense that had no mandatory minimum prison term," *id.*, rather than the ten-year mandatory minimum term specified by the narcotics count.  The Second Circuit thus affirmed the conviction, stating that the appellant "ha[d] not shown any reasonable probability that he would not have pleaded guilty to [the Section 924(c) charge]" had *Davis* been in effect at that time.  *Id.* at 159.

As the Government observes (Dkt. #455 at 5), the record here is stronger than that in *Dussard.*  Where in that case, the Second Circuit had to search the record for proof of a qualifying predicate offense to which that defendant had not admitted, here, Mr. Otero pleaded guilty to a dual-predicate Section 924(c) offense; he allocuted to both predicates; and the narcotics conspiracy predicate remains viable after *Davis*.  More than that, Mr. Otero obtained several benefits from the Plea Agreement, including a plea to a lesser-included offense that did not involve the discharge of a firearm and dismissal of a narcotics charge that carried a ten-year mandatory minimum.  *See Kilpatrick*,

2021 WL 3354737, at *3 (finding no plain error as to two defendants who pleaded guilty to Section 924(c) counts with crime of violence predicates, where record disclosed basis for narcotics offense predicates as to both, and where plea agreements were favorable to defendants); *United States* v. *Gomez*, 849 F. App'x 11, 12 (2d Cir. 2021) (summary order) (finding no plain error where Section 924(c) conviction "just as easily could have been based on the drug trafficking charge," and where plea offer gave defendant "significant incentive to plead guilty"). Accordingly, the Court finds no basis to vacate Mr. Otero's Section 924(c) conviction, and denies his Section 2255 motion.

## B.     The Court Grants in Part Mr. Otero's Motion for Compassionate Release

At the time he filed his initial compassionate release motion, Mr. Otero was housed at the Gilmer Federal Correctional Institution in Glenville, West Virginia ("FCI Gilmer"). During the pendency of his motion, Mr. Otero was transferred several times, including to the United States Penitentiary in Leavenworth, Kansas ("USP Leavenworth"), before arriving at the Federal Correctional Institution in Oxford, Wisconsin ("FCI Oxford"), where he is currently housed. Mr. Otero requests that the Court grant his motion for compassionate release in the form of release from BOP custody. As discussed in the remainder of this section, the Court grants his motion in part by reducing his remaining term of imprisonment.

### 1.     Applicable Law

Under 18 U.S.C. § 3582(c)(1)(A)(i), as modified by the First Step Act, Pub. L. No. 115-391, 132 Stat. 5194 (Dec. 21, 2018), a court may reduce a

defendant's sentence upon motion of the Director of the BOP, or upon motion of the defendant.  A defendant may move under § 3582(c)(1)(A)(i) only after the defendant has "fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier."  *Id.*; *cf. United States* v. *Saladino*, 7 F.4th 120, 124 (2d Cir. 2021) (discussing circumstances resulting in waiver or forfeiture of the exhaustion requirement).  The parties agree that Mr. Otero has satisfied the administrative exhaustion requirement.  (*See* Dkt. #502 at 6; Dkt. #506 at 2 n.2).

When considering an application under Section 3582(c)(1)(A)(i), a court may reduce a defendant's sentence only if it finds that "extraordinary and compelling reasons warrant such a reduction," and that "such a reduction is consistent with the applicable policy statements issued by the Sentencing Commission."  18 U.S.C. § 3582(c)(1)(A)(i); *see generally United States* v. *Kimbell*, No. 21-288, 2021 WL 5441249, at *1 (2d Cir. Nov. 22, 2021) (summary order).  "The defendant has the burden to show he is entitled to a sentence reduction."  *United States* v. *Ebbers*, No. 02 Cr. 1144-3 (VEC), 2020 WL 91399, at *4 (S.D.N.Y. Jan. 8, 2020) (citing *United States* v. *Butler*, 970 F.2d 1017, 1026 (2d Cir. 1992)).

The Second Circuit has summarized the standards pursuant to which district courts must evaluate compassionate release applications:

Section 3582(c)(1)(A) authorizes a court to reduce a previously imposed term of imprisonment upon finding that "extraordinary and compelling reasons warrant such a reduction." 18 U.S.C. § 3582(c)(1)(A)(i). A court deciding a compassionate release motion can consider "the full slate of extraordinary and compelling reasons that an imprisoned person might bring before [it]." *United States* v. *Brooker*, 976 F.3d 228, 237 (2d Cir. 2020). But there are three requirements that must be satisfied before a court can grant such relief. First, absent waiver or forfeiture by the government, an inmate must exhaust administrative remedies by requesting such relief from prison authorities. Specifically, an inmate may ask the sentencing court to consider reducing a sentence only "after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." 18 U.S.C. § 3582(c)(1)(A); *see also United States* v. *Saladino*, 7 F.4th 120, 124 (2d Cir. 2021) (holding that the government may waive or forfeit the exhaustion requirement). Second, a court must "consider[ ] the factors set forth in [18 U.S.C. §] 3553(a) to the extent that they are applicable." 18 U.S.C. § 3582(c)(1)(A); *see* [*United States* v. *Jones*, 17 F.4th 371, 374-75 (2d Cir. 2021)]. Section 3553(a), in turn, lists numerous factors a court must review when imposing a sentence. These include, as most relevant here, "the nature and circumstances of the offense and the history and characteristics of the defendant"; "the need for the sentence imposed ... to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense"; "the need for the sentence imposed ... to provide the defendant with ... correctional treatment in the most effective manner"; and "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a). Third, the inmate must demonstrate that his proffered circumstances are indeed "extraordinary and compelling" such that, in light of these § 3553(a) factors, a sentence reduction is justified under § 3582(c)(1)(A) and would not simply constitute second-guessing of the sentence previously imposed.

22

*United States* v. *Keitt*, 21 F.4th 67, 71 (2d Cir. 2021); *accord United States* v. *Halvon*, 26 F.4th 566, 570 (2d Cir. 2022); *see also United States* v. *Martinez*, No. 06 Cr. 987-1 (DC), 2021 WL 3374530, at *2 (S.D.N.Y. Aug. 2, 2021) (discussing what can qualify as "extraordinary and compelling reasons"). The court's discretion includes the power to reduce, as well as to eliminate, the remaining term of a defendant's sentence. *See Brooker*, 976 F.3d at 237.

### 2. Discussion

Mr. Otero seeks resentencing to a term of time served or to a term where the remainder of his term of imprisonment can be converted to a term of home confinement. (Dkt. #634 at 4). In support, Mr. Otero proffers submissions from mental health professionals, contending that the mental health issues identified during Mr. Otero's prosecution and sentencing have only worsened as a result of his incarceration, particularly in light of measures taken by the BOP in response to the ongoing COVID-19 pandemic. (*See, e.g.*, Dkt. #496-4, 496-5). Separately, Mr. Otero argues the that BOP has "mismanaged" its response to the pandemic by coupling prolonged periods of inmate segregation and isolation with a marked disregard of social distancing and basic hygienic precautions. (Dkt. #506 at 3; *see also* Dkt. #634 at 1, 4). The Government responds that BOP has responded appropriately to an evolving public health crisis, and that Mr. Otero has squandered numerous opportunities to receive treatment by not advising BOP personnel of his mental health issues. (Dkt. #502 at 6; Dkt. #637 at 1-2).

To begin, the Court does not believe that the continued existence of the COVID-19 pandemic, in and of itself, amounts to an extraordinary and compelling reason warranting compassionate release.   The Court has reviewed BOP statistics, and is pleased to learn that facility and community conditions have improved to the point that all BOP facilities, including FCI Oxford, are now classified by the BOP as Level 1 facilities, operating with minimal modifications.  *See* https://www.bop.gov/coronavirus/covid19_modified_operations_guide.jsp (last accessed Mar. 29, 2023) (explaining that Level 1 operational level requires a medical isolation rate within the facility of less than 2%, as well as a community risk rate of fewer than 100 new positive cases per 100,000 inhabitants in the county where the facility is located).  The BOP also reports that FCI Oxford currently has one inmate and no staff who have recently tested positive for the COVID-19 virus.  https://www.bop.gov/coronavirus/ (last accessed Mar. 29, 2023).

To be sure, the COVID-19 pandemic is not fully in the rearview mirror. However, despite the widespread availability of COVID-19 vaccines for more than two of the three years of the pandemic, Mr. Otero continues to refuse the vaccine.  (Dkt. #637 at 1 (noting repeated refusals of both COVID-19 and influenza vaccine)).  To borrow from a sister court in this District, "[i]nsofar as [Mr. Otero] is unable to claim any risk from COVID-19 not faced by the rest of the populace, and is unwilling to take the single step — vaccination — that would most stand to reduce a person's risks from COVID-19, [Mr. Otero],

24

under the assembled case law, cannot claim to face 'extraordinary and compelling' circumstances." *United States* v. *Fernandez*, No. 13 Cr. 20 (PAE), 2023 WL 2584197, at *3 (S.D.N.Y. Mar. 21, 2023) (collecting cases); *see generally United States* v. *Felipe*, No. 18 Cr. 744-2 (KPF), 2022 WL 36832, at *4 (S.D.N.Y. Jan. 3, 2022) (collecting cases where district courts have denied compassionate release requests made by movants who have declined to receive the COVID-19 vaccine).

Mr. Otero does not simply cite to the COVID-19 pandemic, but rather to the interplay of the pandemic and the BOP's response to it as an exacerbation of Mr. Otero's pre-existing mental health issues. (*See, e.g.*, Dkt. #496 at 6-18; Dkt. #506 at 3; Dkt. #539 at 1; Dkt. #634 at 1-4). Relatedly, Mr. Otero claims that the BOP has flouted this Court's directive that he receive mental health treatment while incarcerated. The Court has reviewed with care the reports of the mental health professionals who evaluated Mr. Otero both during his prosecution and, more recently, in connection with his compassionate release motion. The current diagnoses — which include post-traumatic stress disorder, severe generalized anxiety disorder, and moderately severe depressive disorder — are serious, as are the claims of debilitation and suicidal ideations outlined in the defense submissions. (*See, e.g.*, Dkt. #496, 506, 634). And yet the Court has difficulty reconciling the claims in Mr. Otero's submissions with his BOP records. As the Government has noted (Dkt. #502 at 6; Dkt. #637 at 2), Mr. Otero does not appear to have advised BOP medical or mental health professionals of any acute need for mental health treatment.

In July 2021, Mr. Otero met with a clinician at FCI Gilmer to "to monitor his mental status as well as to identify and discuss any new and/or ongoing psychosocial stressors." (July 16, 2021 Clinician's Note).  Mr. Otero explained that the genesis of his inquiry was his then-pending compassionate release motion; the clinician observed "no clinical features in support of a mental health diagnosis (DSM-5) at this time" (*id.*), but recommended that Mr. Otero participate in the Trauma Education Program and "notify staff if needs arise prior to follow-up with Psychology Services" (*id.*).  A clinician's note from an interview with Mr. Otero on December 8, 2021 — which interview was occasioned by Mr. Otero's placement in segregated housing — reflected that Mr. Otero "did not appear in immediate distress, nor did he report any mental health concerns," and was reminded to contact Psychology Services if he needed to access services.  (December 8, 2021 Clinician's Note).

Mr. Otero completed a Health Intake Assessment/History form in connection with his transfer from FCI Gilmer to USP Leavenworth; he did not indicate any history of mental health issues.  (December 27, 2021 Health Intake Assessment/History Form; *see also* February 16, 2022 Health Screen Report).  In March 2022, after his transfer to USP Leavenworth, Mr. Otero attempted to participate in a drug education program administered through that facility's Psychology Services unit, but was removed from the program after missing the first two sessions.  (April 7, 2022 Administrative Note).  In July and August 2022, Mr. Otero participated in a group therapy program known as the Resolve Psychology Treatment Program, for which he received a

26

certificate of completion.  (July 11, 2022 Group Participation Report).

Thereafter, Mr. Otero expressed an interest in participating in USP

Leavenworth's Residential Drug Abuse Program ("RDAP"), for which he was

approved in August 2022.  (August 19, 2022 RDAP – Diagnostic Interview).  Of

note, the clinician who conducted the RDAP screening interview noted that

apart from Mr. Otero's PSR, there was "no other documentation reflecting a

past history of mental hea[l]th diagnoses, symptoms, nor concerns."  (*Id.* at 1).

Thereafter, Mr. Otero was transferred to FCI Oxford.  During a screening

interview on December 5, 2022, Mr. Otero responded in the negative to

questions asking about current mental health complaints and both current

and historical suicidal ideations; at that interview, Mr. Otero presented as

"appropriate to content" in affect.  (December 5, 2022 Health Screen Report).

Psychology Services personnel at FCI Oxford subsequently concluded after

reviewing Mr. Otero's BOP records that "no clinical indications are present

which warrant a clinical interview."  (December 8, 2022 Transfer Intake

Screening Report).

The defense argues that Mr. Otero's reticence does not matter in light of

the Court's explicit directive regarding mental health treatment, and it is true

that the Court expects the BOP to comply with any order it issues.  However, it

remains that case that (i) the Court was not made aware of any mental health

treatment deficiencies until the instant motion was filed many years after Mr.

Otero's sentencing; (ii) BOP clinicians who have met with Mr. Otero have not

perceived a need for more intensive mental health treatment; and (iii) the

person best situated to advise the BOP of acute mental health issues was and remains Mr. Otero.

The proffered deterioration of Mr. Otero's mental health does, however, dovetail with another concern this Court has recognized in prior cases as an extraordinary and compelling circumstance, namely, that the conditions of Mr. Otero's confinement during the COVID-19 pandemic have resulted in a sentence that was more severe than this Court could have contemplated when originally sentencing him in January 2017.  While the Court sought to balance carefully the information then available, it could not have foreseen the restrictions that would be precipitated by the pandemic (including lockdowns and curtailment of facility programming and visitation), nor the public health risks faced by individuals like Mr. Otero who have spent the entirety of the pandemic in a carceral setting, nor the length of time over which these risks and deprivations would persist.  And in a prior decision resolving a compassionate release motion, the Court recognized "that courts reviewing motions for sentence modifications have considered the extent to which onerous lockdowns and restrictions imposed by correctional facilities attempting to control the spread of the virus have made sentences 'harsher and more punitive than would otherwise have been the case.'"  *United States* v. *Hatcher*, No. 18 Cr. 454-10 (KPF), 2021 WL 1535310, at *3 (S.D.N.Y. Apr. 19, 2021) (quoting *United States* v. *Rodriguez*, 492 F. Supp. 3d 306, 311 (S.D.N.Y. 2020)); *see also United States* v. *Mcrae*, No. 17 Cr. 643 (PAE), 2021 WL 142277, at *5 (S.D.N.Y. Jan. 15, 2021) ("[A] day spent in prison under extreme lockdown

and in fear of contracting a deadly virus exacts a price on a prisoner beyond that imposed by an ordinary day in prison.  While not intended as punishment, incarceration in such conditions is, unavoidably, more punishing.").  In short, the Court has previously concluded, and concludes here, that pandemic-induced conditions of confinement can constitute "extraordinary and compelling" circumstances warranting compassionate release for certain defendants who have (i) served long sentences and (ii) been detained for the entirety of the pandemic.

Here, there can be no serious dispute that Mr. Otero has experienced harsher conditions of confinement than could have been anticipated, and the Court finds that the length and totality of these conditions amount to extraordinary and compelling circumstances under Section 3582(c)(1)(A)(i).  It therefore proceeds to consider whether relief in the form of a reduced sentence is warranted in this case in light of the factors set forth in 18 U.S.C. § 3553(a).[7]

---

[7]     While considering all of the factors, the Court has focused on several in resolving this motion, including:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed—
>
>> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>>
>> (B) to afford adequate deterrence to criminal conduct;
>>
>> (C) to protect the public from further crimes of the defendant; and
>>
>> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
>
> ***

A careful analysis of the Section 3553(a) factors counsels both in favor of, and against, a sentence reduction.  Mr. Otero's offense conduct was egregious by any measure, and the violence he employed places him in the upper echelon of criminal defendants sentenced by the Court.  It is not an exaggeration to state that Mr. Otero and the Taylor Avenue Crew terrorized a Bronx neighborhood for several years.  The Court also notes that Mr. Otero had a prior arrest in March 2012 in which he was found to be in possession of crack cocaine and a loaded firearm.  (PSR ¶ 50).  While incarcerated, Mr. Otero has been the subject of four disciplinary incidents, though the Court agrees with the defense that the incidents themselves are comparatively minor and that the most recent one occurred more than three years ago.  (Inmate Discipline Data Report).

As countervailing facts, the Court observes that Mr. Otero has been detained for his offense conduct since September 2015.  His BOP records reflect efforts to take advantage of the programs available at each of the facilities in which he has been housed.  (*See, e.g.*, Dkt. #634 at 4 (discussing participation in RDAP and Life Connections programs)).  And even if they may have been motivated by his current compassionate release motion, the Court acknowledges the mental health treatment that Mr. Otero has received between July 2021 and the present.

---

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct[.]

18 U.S.C. § 3553(a)(1), (2), (6).

After considering all of the Section 3553(a) factors, and after considering as well Mr. Otero's BOP records and information concerning the conditions of his confinement, the Court grants Mr. Otero's motion in part, by reducing his sentence by 18 months.

## CONCLUSION

For the reasons set forth above, the Court DENIES Mr. Otero's motion pursuant to 28 U.S.C. § 2255.  Because Mr. Otero has not made a substantial showing of the denial of a constitutional right, the Court will not issue a certificate of appealability.  *See* 28 U.S.C. § 2253(c).  The Court further certifies under 28 U.S.C. § 1915(a)(3) that any appeal from this portion of the Opinion would not be taken in good faith, and therefore *in forma pauperis* status is denied for the purpose of an appeal.  *See Coppedge* v. *United States*, 369 U.S. 438, 444-45 (1962).  The Clerk of Court is directed to close Case No. 20 Civ. 4711.

The Court GRANTS IN PART Mr. Otero's second motion for compassionate release under 18 U.S.C. § 3582(c)(1)(A), insofar as it reduces his aggregate term of imprisonment in Case No. 15 Cr. 608 from 150 months to 132 months.  All other aspects of the sentence remain in effect.

The Clerk of Court is directed to enter this Opinion and Order in both Case Nos. 15 Cr. 608 and 20 Civ. 4711.  In addition, the Government is directed to transmit this Opinion and Order to the relevant BOP personnel, who are in turn directed to review the Court's directive in the judgment and commitment order for mental health treatment for Mr. Otero.  (*See* Dkt. #182).

31

SO ORDERED.

Dated:   March 29, 2023
         New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge